*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* FOUST, Minors.

UNPUBLISHED
December 17, 2020

Nos. 349545; 349761
Genesee Circuit Court
Family Division
LC No.  16-133553-NA

Before:  LETICA, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

In this consolidated appeal, respondents appeal the trial court's order terminating their parental rights to their minor children, AF and KF, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood that the children will be harmed if returned to the parents).[1]  We affirm in both dockets.

## I.  BACKGROUND

This matter began when a petition was filed in October 2016.  In relevant part, the petition concerned AF, KF, and BF, who is respondents' oldest son.[2]  The petition alleged that respondent-mother had a history of substance abuse and that, although respondent-mother had been offered services in the past, she had been uncooperative.  It was further alleged that the children were not being properly supervised and that, on October 7, 2016, the children were found alone outside while respondent-mother was unresponsive after having consumed cocaine.  It was also alleged that the children were often absent from or tardy to school and that AF and KF, who are twins, were being medically neglected.  Respondent-mother also had unstable, unsuitable housing.  It

---

[1] The trial court's order concerning the statutory grounds references MCL 712A.19b(3)(h). However, review of the order establishes that the trial court intended to cite MCL 712A.19b(3)(j).

[2] BF is not a party to this appeal.  However, because respondent-mother's relationship with BF and ability to care for BF is relevant to one of the issues on appeal in Docket No. 349545, BF will be referenced in this opinion where it is appropriate to do so.

-1-

was alleged that the home where respondent-mother was staying with the children contained "[i]llicit drugs" and "[d]rug paraphernalia." The petition also alleged that the home was "unsuitable" because of "excessive clutter." At the time the petition was filed, respondent-father was serving a prison sentence.[3] The petition requested that the trial court remove the children from respondents' care and custody and exercise jurisdiction.

After a preliminary hearing was held on October 13, 2016, the petition was authorized, and it was ordered that the children would be placed in foster care. Respondent-mother was granted supervised parenting time. The trial court ordered that respondent-father would no longer be considered a respondent in the child protective proceeding. Specifically, the trial court noted that the petition did not contain any allegations of wrongdoing against respondent-father. However, the trial court held that respondent-father should be able to have contact with the children through letters and telephone calls, if possible.

On November 15, 2016, a hearing was held. Although respondent-mother was provided with notice, she failed to appear. It was reported that respondent-mother was "showing up significantly late for visitation," that she appeared to be under the influence during visits, and that she had tested positive for illegal substances, including marijuana, cocaine, and amphetamines. The trial court declined to suspend the visitations, but ordered respondent-mother to confirm her attendance in advance. Caseworkers were also given discretion to cancel the visitations if respondent-mother was under the influence.

On December 6, 2016, respondent-mother pleaded *nolo contendere* to several allegations in the petition. Thereafter, the trial court exercised jurisdiction and ordered that reasonable efforts toward reunification be made with respect to respondent-mother. The trial court immediately proceeded to the dispositional phase and heard the caseworker's recommendations, which the trial court adopted. It was noted that respondent-mother had been testing positive for illegal substances and that two parenting time visits had to be cancelled because respondent-mother failed to "call in time." Respondent-mother was ordered to submit to a psychological evaluation and a substance abuse assessment, and to comply with and benefit from the recommendations. Respondent-mother was also ordered to submit to substance screenings, to comply with and benefit from parenting coaching or education, to obtain suitable housing and a legal source of income, and to sign necessary releases. It was noted that respondent-mother would be referred to Family Dependency Drug Court.[4]

At the end of January 2017, respondent-mother was accepted into the Family Dependency Drug Court program. On February 8, 2017, respondent-mother attended her first hearing, where she was officially welcomed into the program and was instructed about the importance of being

---

[3] In 2013, respondent-father was convicted of unarmed robbery, possession of a firearm during the commission of a felony, felon in possession of firearm, and larceny of a firearm. As discussed later in this opinion, respondent-father became eligible for parole in March 2019 but parole was denied. His maximum release date is April 2028.

[4] The purpose of Family Dependency Drug Court is to "teach a substance abuse free lifestyle" and to reunify parents with their children.

compliant with the services being provided to her. After the February 8, 2017 hearing, respondent-mother missed treatment and compliance appointments, missed drug screenings, and tested positive for illegal substances. Ultimately, on February 22, 2017, the trial court found respondent-mother to be in contempt and sentenced her to 21 days in jail. The trial court ordered that respondent-mother would be released early if a bed became available in an inpatient treatment center. On March 20, 2017, respondent-mother entered an inpatient treatment center and was discharged 14 days later. After being discharged, she continued to use illegal substances, missed drug screenings and appointments, and failed to attend certain appointments on time.

Respondent-mother returned to residential treatment on April 12, 2017, but tested positive for cocaine on May 8, 2017. She completed the program on May 22, 2017 and was discharged. Thereafter, respondent-mother began to consistently work with a parenting coach and attend visitations with the children. However, respondent-mother failed to be entirely compliant with completing her drug screenings. During a June 14, 2017 hearing, it was reported that respondent-mother had tested positive for illegal substances on three separate occasions since being released from treatment. Respondent-mother failed to attend that hearing because she was in jail on a charge of possession of cocaine, which dated back to December 19, 2016. After respondent-mother was released from jail, she continued to test positive for illegal substances and missed drug screenings. Respondent-mother returned to inpatient treatment on August 1, 2017, only to leave the following day. After testing positive for cocaine and failing to submit to a screening, respondent-mother was terminated from Family Dependency Drug Court on August 9, 2017.

On August 23, 2017, a permanency planning hearing was held. It was noted that respondent-mother continued to be unemployed, that she continued to have unstable housing, and that she had criminal matters pending. Although respondent-mother had completed working with the parenting coach, testimony supported that she did not fully benefit from that service. It was also reported that respondent-mother sometimes had inappropriate conversations with the children during parenting time. The guardian ad litem indicated that, if not for the fact that respondent-father was not named as a respondent in the matter, she would advocate for the permanency planning goal to be changed from reunification to adoption. The referee who was presiding over the hearing agreed with the guardian ad litem that little progress had been made in the 10 months since the children had been taken into care. Based on the request of respondent-mother's attorney, the trial court ordered that respondent-mother be referred for a psychological evaluation, which respondent-mother completed on September 12, 2017. The evaluator believed that respondent-mother would have issues parenting the children due to her substance abuse and untreated mental health issues, which included anxiety, depression, and attention deficit disorder.

During a November 15, 2017 review hearing, it was revealed that respondent-mother had tested positive for illegal substances, had failed to attend some substance screenings, and had refused to take her psychotropic medication during the review period. Respondent-mother had also been late to two visitations and had difficulty managing AF, BF, and KF at the same time. Respondent-mother continued to be unemployed and was living with the children's maternal grandmother. The trial court ordered that a supplemental petition be filed and that respondent-father be provided with weekly telephone contact with the children.

On November 30, 2017, petitioner filed a supplemental petition, requesting that the trial court terminate respondent-mother's parental rights to the children under MCL 712A.19b(3)(c)(*i*),

(g), and (j). The supplemental petition alleged that respondent-father was unable to provide proper care and custody to the children because he was incarcerated and had not named any relatives who were able to provide care to the children for the remainder of his incarceration. Petitioner requested that the trial court exercise jurisdiction as to respondent-father.

After a preliminary hearing was held, the supplemental petition was authorized. However, during a February 1, 2018 hearing, petitioner noted its concern that it would not be "appropriate" "to litigate the termination petition with" respect to respondent-mother given that termination with respect to respondent-father could not yet be sought. Petitioner noted that, even if the trial court terminated respondent-mother's rights, the children would not be able to obtain permanency through adoption for a period of time. Therefore, the petitioner withdrew the termination request with respect to respondent-mother. Although respondent-mother was in jail at the time of the hearing, it was reported that she intended to enter inpatient treatment when she was released.[5]

On March 28, 2018, respondent-father admitted that he was incarcerated and did not have a family member to whom he was able to direct placement of the children. The trial court exercised jurisdiction and immediately moved into the dispositional phase of the proceeding. It was ordered that reasonable efforts towards reunification would be made. Specifically, the trial court ordered that respondent-father be provided with weekly telephone contact with the children and that the caseworker provide respondent-father with documentation concerning the proceeding "no later than 5 business days before . . . scheduled hearing[s]."

On May 18, 2018, respondent-mother was arrested and charged with felony "grand theft auto." On July 2, 2018, respondent-mother was released from jail on bond. She tested positive for cocaine on July 5, 2018, and continued to refuse to take psychotropic medication. During a July 12, 2018 hearing, it was noted on the record that respondent-mother had been inconsistent with attending visitations and was sometimes late. It was also noted that the children required consistency. Respondent-mother was warned that her visitations, which were held once each week for one hour, would be suspended if she did not consistently attend them and appear in a timely manner.

On August 20, 2018, respondent-mother entered the Felony Drug Court program. It was agreed that, if respondent-mother successfully completed the Felony Drug Court program, her "grand theft auto" charge would be dismissed. On September 29, 2018, respondent-mother tested positive for illegal substances.

On October 12, 2018, petitioner filed a second supplemental petition, requesting that the trial court terminate respondents' parental rights to the children under MCL 712A.19b(3)(c)(*i*), (g), and (j). The second supplemental petition was authorized following a preliminary hearing.

On October 25, 2018, respondent-mother entered inpatient treatment as a Felony Drug Court sanction for testing positive for illegal substances on September 29, 2018. She was discharged from treatment on November 21, 2018. Because respondent-mother had demonstrated

---

[5] It appears that respondent-mother was in jail because she had either been charged with or convicted of driving while license suspended. It is unclear when she was released from jail.

progress with remaining sober, she was granted an additional parenting time visit each week.  In January 2019, respondent-mother was "promoted" to phase two of the Felony Drug Court program.

The statutory grounds portion of the termination hearing was held over the course of several days in February and March 2019.  During the hearing, caseworkers testified about respondent-mother's lack of progress for most of the proceeding.  However, it was agreed that, after the second supplemental petition was filed in October 2018, respondent-mother began to demonstrate improvement with consistently and timely attending parenting visitations.  Her parenting skills and commitment to maintaining sobriety had also improved.  However, respondent-mother had not yet obtained stable housing or income.  Respondent-mother and respondent-father both testified on their own behalf.  Although respondent-father was eligible for parole in March 2019, it was disclosed at the March 29, 2019 hearing that he had been "flopped" and that he would not be eligible for release until March 2020.

After the close of proofs, the trial court took the matter under advisement and issued a written opinion on May 30, 2019.  The trial court's written opinion noted that petitioner was seeking termination under MCL 712A.19b(3)(c)(*i*), (g), and (j) as to BF, AF, and KF.  After reviewing the procedural background, respondent-mother's psychological evaluation, and the testimony presented at the termination hearing and making findings of fact, the trial court concluded that "there is . . . clear and convincing evidence as to each of the statutory sections, which provides a basis for termination as to each parent."  The trial court concluded that it was therefore proper to "proceed to the Best Interest Phase."

The best-interest hearing began on May 30, 2019, at which point the trial court conducted interviews with the children in chambers.  Only the guardian ad litem, who was present in chambers during the interviews, was permitted to ask questions.  The interviews were recorded and were able to be viewed by those present in the courtroom.  After interviewing the children and hearing testimony from the children's mental health providers, caseworkers, AF and KF's foster mother, respondent-mother, and the children's maternal grandmother, the trial court found that termination of respondents' parental rights to AF and KF was in their best interests in a June 5, 2019 opinion and order.  However, the trial court concluded that termination of respondents' parental rights to BF was not in his best interests.  The trial court ordered that BF be returned to respondent-mother's care "no later than July 3, 2019[.]"  These appeals followed.

## II.  ANALYSIS

### A.  RESPONDENT-MOTHER (DOCKET NO. 349545)

#### 1.  ADJUDICATION

Respondent-mother first argues that, when accepting her *nolo contendere* plea to establish jurisdiction, the trial court erred by failing to comply with MCR 3.971(B)(4).  Specifically, respondent-mother argues that the trial court failed to advise her that her plea could be used against her during subsequent termination proceeding.

Because respondent-mother did not move to withdraw her plea in the trial court or otherwise object to the advice of rights that were provided, this issue is unpreserved, and we apply the plain-error standard set forth in *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999).  See

*In re Pederson*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 349881); slip op at 8. In order to avoid forfeiture under the plain error test,

> 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) . . . the plain error affected substantial rights . . . [, and 4)] once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted . . . when the plain, forfeited error . . . seriously affected the fairness, integrity or public reputation of judicial proceedings . . . . [*People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018), quoting *Carines*, 460 Mich at 763-764 (alterations and some ellipses in original).]

An error has affected a party's "substantial rights when there is 'a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings.' " *People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019), quoting *Carines*, 460 Mich at 763. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Carines*, 460 Mich at 763 (quotation marks and citation omitted).

As noted by this Court in *In re Pederson*, ___ Mich App at ___; slip op at 9,

> "In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). The family court determines whether to take jurisdiction of the child during the adjudicative phase. *Id*. The "fact-finding adjudication of an authorized petition to determine if the minor comes within the jurisdiction of the court" is called a "trial." MCR 3.903(A)(27) . . . . A parent may also waive his or her right to a trial and admit the allegations in a petition or plead no contest to them. MCR 3.971(A); *In re Sanders*, 495 Mich at 405.

> Pleas generally waive certain rights . . . . "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v United States*, 397 US 742, 748; 90 S Ct 1463; 25 L Ed 2d 747 (1970). Hence, for a plea to constitute a valid waiver of constitutional rights, the person entering it must be made "fully aware of the direct consequences of the plea." *People v Cole*, 491 Mich 325, 333; 817 NW2d 497 (2012) (quotation marks and citation omitted). "A consequence is 'direct' where it presents 'a definite, immediate and largely automatic effect' on the defendant's range of punishment." *United States v Kikuyama*, 109 F3d 536, 537 (CA 9, 1997), quoting *United States v Wills*, 881 F2d 823, 825 (CA 9, 1989).

In the context of jurisdictional pleas in child protective proceedings, "[o]ur court rules reflect this due-process guarantee." *In re Ferranti*, 504 Mich 1, 21; 934 NW2d 610 (2019). MCR 3.971 provides, in relevant part, as follows:

> **(B) Advice of Rights and Possible Disposition.** Before accepting a plea of

admission or plea of no contest, the court must advise the respondent on the record or in a writing that is made a part of the file:

> (1) of the allegations in the petition;

> (2) of the right to an attorney, if respondent is without an attorney;

> (3) that, if the court accepts the plea, the respondent will give up the rights to

> (a) trial by a judge or trial by a jury,

> (b) have the petitioner prove the allegations in the petition by a preponderance of the evidence,

> (c) have witnesses against the respondent appear and testify under oath at the trial,

> (d) cross-examine witnesses, and

> (e) have the court subpoena any witnesses the respondent believes could give testimony in the respondent's favor;

> (4) *of the consequences of the plea, including that the plea can later be used as evidence in a proceeding to terminate parental rights if the respondent is a parent.* [Emphasis added.]

In this case, the trial court failed to advise respondent-mother on the record that her plea could "later be used as evidence in a proceeding to terminate parental rights," and a written advice of rights form containing such information does not appear in the record. Thus, by failing to properly advise respondent-mother as required by MCR 3.971(B)(4) that her plea could "later be used as evidence in a proceeding to terminate parental rights," the trial court plainly erred.

With regard to the prejudice prong of the plain-error test, we note that this case is similar to *In re Pederson*. In *In re Pederson*, the trial court advised the respondents of most of their rights under MCR 3.971(B) but failed to inform the respondents that their pleas of admission could "later be used as evidence in a proceeding to terminate parental rights[.]" *In re Pederson*, ___ Mich App at ___; slip op at 10. Although this Court determined that the trial court plainly erred, this Court concluded that the respondents could not establish that their substantial rights were affected. *Id.* at __; slip op at 10-13. In so holding, this Court indicated as follows:

> [W]e conclude that [the] respondents have failed to carry their burden of demonstrating that the adjudicatory error at issue in this case was outcome-determinative. More specifically, in *In re Ferranti*, 504 Mich at 30-31, our Supreme Court found error warranting reversal based on a finding that, because the trial court failed to advise respondents of the rights they were waiving and the potential consequences of their pleas, the trial court violated their due process rights because the pleas were unknowing and involuntary. It was undisputed in that case

-7-

that the trial court's advice of rights was deficient because the trial court failed to advise the respondents of "any" of the waived rights enumerated by MCR 3.971(B)(3) or (B)(4). *Id*. at 31.

MCR 3.971(B)(3) lists the rights that a parent waives by virtue of entering a plea, as opposed to requiring petitioner to proceed to trial and prove the allegations contained in the petition by a preponderance of the evidence. MCR 3.972(C)(1). The rights outlined in MCR 3.971(B)(3) are particularly important because they directly relate to the adjudicative stage of the child protective proceeding. The adjudicative stage is a critical stage in the proceeding because if the trial court exercises jurisdiction, then the parent will be unable to control the care and custody of his or her child, *In re Deng*, 314 Mich App 615, 626; 887 NW2d 445 (2016), and will be subjected to "the dispositional authority of the court," MCR 3.903(A)(27). See *In re Sanders*, 495 Mich at 405-406 ("While the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights.") (quotation marks and citation omitted.). In contrast, if the trial court determines that it lacks authority to exercise jurisdiction, the minor child must be returned to the care of his or her parent(s) . . . . The importance of the adjudicative stage is reflected by the fact that it is the only stage of the proceeding when a parent is entitled to a trial. See also MCR 3.977(A)(3); *In re Sanders*, 492 Mich at 405-406. Thus, by failing to advise the respondents of the rights outlined in MCR 3.971(B)(3), the trial court in *In re Ferranti* effectively tainted the adjudicative stage of the proceeding.

This case does not feature the numerous errors that occurred in *In re Ferranti*. [The] [r]espondents in this case only take issue with the fact that the trial court failed to advise them that their pleas could "later be used as evidence in a proceeding to terminate parental rights" as required by MCR 3.971(B)(4). Thus, unlike the parents in *In re Ferranti*, [the] respondents in this case were informed of most of the rights that they were waiving, including their rights to a trial by judge or jury, to have witnesses against them appear, and to subpoena witnesses. Moreover, the transcript of the plea proceeding supports that [the] respondents reviewed the allegations in the petition with their attorney, who represented them at the plea hearing. See MCR 3.971(B)(1) and (2). The record also supports that [the] respondents discussed the allegations contained in the petition with their attorney and considered their decision.

\* \* \*

Each of the allegations that [the] respondents were pleading to were read aloud at the hearing. Thus, [the] respondents were clearly advised of the allegations to which they were pleading. Additionally, and importantly, [the] respondents confirmed that they were entering pleas of their own free will.

\* \* \*

-8-

Although [the] respondents were not informed that their pleas could "later be used as evidence in a proceeding to terminate parental rights," [the] respondents were informed on several occasions that, if the pleas were accepted, a consequence of their pleas would be that they would be required to comply with the case service plans. The record of the plea proceeding supports that [the] respondents had reviewed the case service plans before the plea hearing. Furthermore, [the] respondents were informed several times that another possible consequence of their pleas was that their parental rights could be terminated if they did not comply with the case service plans. [The] [r]espondents indicated under oath that they understood this, thereby supporting that they understood the nature and the consequences of their pleas. [*In re Pederson*, ___ Mich App at ___; slip op at 10-12.]

This case, like *In re Pederson*, does not "feature the numerous errors that occurred in *In re Ferranti*" given that respondent-mother only takes issue "with the fact that the trial court failed to advise [her] that [her] plea[] could 'later be used as evidence in a proceeding to terminate parental rights' as required by MCR 3.971(B)(4)." *In re Pederson*, ___ Mich App at ___; slip op at 11. At the plea hearing, the trial court confirmed on the record that respondent-mother had reviewed the allegations in the petition with her attorney, who represented her at the hearing. Thereafter, the trial court accurately "paraphrased" the specific allegations to which respondent-mother agreed to plead *nolo contendere*. The trial court indicated as follows:

It says that the home that you were residing in with the children was excessively cluttered, elicit drugs were found in the home including marijuana, drug paraphernalia including a bowl and a lighter. It says that [respondent-mother] was habitually using drugs including cocaine, amphetamines, methamphetamines, and THC which prevented the proper care and supervision and custody for the children.

The trial court then stated "[t]hose are the allegations" and noted that respondent-mother's attorney had indicated that respondent-mother was "going to plead no contest." The trial court then explained what it meant to plead *nolo contendere* and confirmed that respondent-mother understood. The trial court explained that "ordinarily parents have the right to raise their children without any interference from the government." However, the trial court explained that, if the court acquired jurisdiction by virtue of respondent-mother's plea, it "would have the authority to make decisions about the children to protect them" "on a temporary basis[.]" The trial court also explained that respondent-mother would be "ordered to participate in services in order to correct the problem." Respondent-mother confirmed that she understood. The trial court warned respondent-mother that "[i]f the problem was not corrected" and she "didn't follow through with the plan that [she] would be ordered to participate in, then the petitioner could request termination of rights on that basis[.]"

The trial court also indicated that respondent-mother did "not have to give the jurisdiction" and that she had a right to a trial by judge or by jury and that petitioner would be required to "prove that up in Court by a preponderance of the evidence." Respondent-mother was also informed that she was entitled to have an attorney represent her at trial and that she was giving up those rights by pleading *nolo contendere*. Respondent-mother confirmed that she understood. The trial court explained that respondent-mother would have the right to witnesses "testify in front [of her]" and

-9-

that she would have "the right to question those witnesses." Respondent-mother again confirmed that she understood. The trial court then explained that respondent-mother would have the right to call witnesses on her own behalf. The trial court again confirmed that respondent-mother understood. After the lengthy exchange, the trial court asked respondent-mother if she had any questions. Respondent-mother confirmed that she did not have any questions. Thus, like the respondents in *In re Pederson*, respondent-mother was clearly advised of the allegations to which she was pleading and what would occur if the trial court obtained jurisdiction as a result of her plea.

Furthermore, when asked by the trial court if she was "freely and voluntarily" pleading *nolo contendere*, respondent-mother answered "Yes." Respondent-mother also confirmed that she was pleading knowingly, that she had not been "promised anything," that she had not been threatened, that she was not under the influence, and that she had not had "any difficulties understanding" the trial court. The trial court also confirmed with counsel that there were no "promises or other inducements not reported[.]"

While respondent-mother was not informed that her plea could "later be used as evidence in a proceeding to terminate parental rights," respondent-mother was informed that, if the plea was accepted, a consequence of the plea would be that she would be required to comply with the case service plan to fix "the problem." The record supports that respondent-mother signed the case service plan before the plea hearing, thereby supporting that she had reviewed the plan before she pleaded *nolo contendere*. Furthermore, respondent-mother was informed that another possible consequence of her plea was that her parental rights could be terminated if she did not comply with the case service plan. Respondent-mother indicated under oath that she understood this, thereby supporting that she understood the nature and the consequences of her plea. Thus, unlike the respondents in *In re Ferranti* and like the respondents in *In re Pederson*, "this is not a case involving a complete failure to address the requirements listed in MCR 3.971(B)(4)."

Furthermore, as this Court stated in *In re Pederson*, ___ Mich App at ___; slip op at 12-13:

> MCR 3.971(B)(4) relates to the dispositional phase of the proceedings—as opposed to the adjudicative phase—in that (B)(4) does not address the rights associated with an adjudication trial. Rather, MCR 3.971(B)(4) concerns how entering a plea at the adjudication stage could later be used against respondents during the dispositional phase. Thus, unlike in *In re Ferranti*, the adjudicative stage was not tainted by the trial court's failure to advise respondents of their rights under MCR 3.971(B)(4). Rather, [the] respondents were aware that they were giving up the right to an adjudication trial before entering pleas.

> Additionally, we conclude that the trial court's error did not affect the outcome of the dispositional phase of the proceedings. More specifically, in *In re Ferranti*, 504 Mich at 12, the trial court relied on two statutory grounds for termination: MCL 712A.19b(3)(c)(*i*) (conditions that led to the adjudication continue to exist) and MCL 712A.19b(3)(g) (parent is unable to provide proper care and custody). In addition to citing both of those grounds, the trial court in this case also relied on MCL 712A.19b(3)(c)(*ii*), under which termination may be

-10-

appropriate on the basis of grounds "other" than those that led to the adjudication. See *In re JK*, 468 Mich 202, 210-212; 661 NW2d 216 (2003). As explained below, the trial court did not clearly err by finding that termination of [the] respondents' parental rights was warranted under MCL 712A.19b(3)(c)(*ii*). Although [the] respondents' pleas served to establish a statutory basis for jurisdiction, because only one statutory ground for termination need be established, *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), and because termination under MCL 712A.19b(3)(c)(*ii*) is, by definition, unrelated to the grounds that led to the adjudication, it follows that the adjudicatory error at issue here did not affect the decision to terminate [the] respondents' parental rights.

Because we cannot conclude from the record that respondents' pleas were not knowingly and voluntarily made or that respondents' decision to plead affected the adjudicative or dispositional stages of the proceeding, we conclude that respondents have failed to carry their burden of demonstrating prejudice. See *Carines*, 460 Mich at 763.

In this case, respondent-mother argues that the facts in *In re Pederson* are distinguishable from the facts herein because it cannot be said that the dispositional phase of the proceeding was not tainted by the trial court's error. We disagree.

The trial court found statutory grounds to terminate respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). Because the trial court did not rely on (c)(*ii*), respondent-mother argues that, unlike in *In re Pederson*, it cannot be said that the grounds for termination were "unrelated to the grounds that led to the adjudication" and that the adjudicatory error did not affect the trial court's decision to terminate respondent-mother's parental rights. According to respondent-mother, the trial court's termination of her "parental rights was based entirely on . . . her substance abuse issues."

Although the trial court considered respondent-mother's substance abuse when concluding that termination was appropriate with respect to AF and KF, respondent-mother's parental rights were not terminated solely because of the issues that were present at adjudication. When terminating respondent-mother's parental rights, the trial court relied on respondent-mother's lack of progress and lack of stability during a majority of the proceeding. Indeed, after the trial court exercised jurisdiction in December 2016, respondent-mother was charged with a felony, failed to obtain steady employment, failed to obtain stable housing, failed to consistently and timely attend visitations with the children, demonstrated poor parenting skills, refused to take psychotropic medication to treat her mental health issues, and married a man whom she had only known for several months. Thus, although the trial court noted respondent-mother's history of substance abuse, the trial court also relied on evidence that was unrelated to the grounds that led to the adjudication. Because we cannot conclude from the record that respondent-mother's plea was not knowingly and voluntarily made or that respondent-mother's decision to plead affected the adjudicative or dispositional stages of the proceeding, we conclude that respondent-mother has failed to carry her burden of demonstrating prejudice. See *In re Pederson*, ___ Mich App at ___; slip op at 13.

-11-

Moreover, even if we were to conclude that respondent-mother's substantial rights were affected, respondent-mother would not automatically be entitled to reversal. Rather, "[r]eversal is warranted . . . when the plain, forfeited error . . . seriously affected the fairness, integrity or public reputation of judicial proceedings." See *Randolph*, 502 Mich at 10. In this case, like in *In re Pederson*, respondent-mother has not argued that she would not have pleaded to some of the allegations in the petition if the trial court had informed her that the plea could be used as evidence against her if termination proceedings commenced. See *In re Pederson*, ___ Mich App at ___; slip op at 13. As already stated, respondent-mother was informed that her parental rights could be terminated if she did not comply with the case service plan. After respondent-mother failed to benefit from the case service plan for nearly two years, termination proceedings were initiated. As discussed later, overwhelming evidence supported termination of respondent-mother's parental rights pursuant to MCL 712A.19b(3)(j) and that termination was in AF and KF's best interests. Based on this record, we conclude respondent-mother is not entitled to relief under plain-error review.

## 2. RIGHT TO COUNSEL

Respondent-mother argues that the trial court erred by failing to ensure that she was properly represented by a court-appointed attorney at each stage of the child protective proceeding. Because this issue is unpreserved, we review for plain error affecting substantial rights. See *In re HRC*, 286 Mich App 444, 450; 781 NW2d 105 (2009).

"This Court has explicitly recognized that the United States Constitution guarantees a right to counsel in parental rights termination cases." *In re Williams*, 286 Mich App 253, 275; 779 NW2d 286 (2009). In addition, MCL 712A.17c provides:

> (4) In a proceeding under section 2(b) or (c) of this chapter, the court shall advise the respondent at the respondent's first court appearance of all of the following:
>
> (a) The right to an attorney at each stage of the proceeding.
>
> (b) The right to a court-appointed attorney if the respondent is financially unable to employ an attorney.
>
> (c) If the respondent is not represented by an attorney, the right to request and receive a court-appointed attorney at a later proceeding.
>
> (5) If it appears to the court in a proceeding under section 2(b) or (c) of this chapter that the respondent wants an attorney and is financially unable to retain an attorney, the court shall appoint an attorney to represent the respondent.

Thus, in a proceeding under MCL 712A.2(b) or (c), an indigent parent is entitled to counsel "at each stage of the proceeding." MCL 712A.17c(4). The court rules similarly reflect a parent's right to counsel in a child protective proceeding. See MCR 3.915(B)(1).

In this case, respondent-mother first takes issue with the fact that she did not have appointed counsel present during several hearings that took place in the Family Dependency Drug Court.

Assuming without deciding that the term "each stage of the proceeding" includes hearings that are held through the Family Dependency Drug Court, we fail to see how respondent-mother's substantial rights were affected by counsel not being present at certain hearings.[6] Respondent-mother was terminated from Family Dependency Drug Court in August 2017 as a result of her failure to comply. This occurred after respondent-mother had checked into three inpatient treatment facilities, one of which she left after a single day. After being terminated, respondent-mother continued to use illegal substances and was charged with a felony. Respondent-mother acknowledged at one of the termination hearings that she continued to use illegal substances until July 2, 2018. Thus, even if respondent-mother is correct that some of her drug screenings were "false positives" and that counsel could have assisted her in advocating for herself, the fact would remain that respondent-mother admitted to using illegal substances almost 11 months after her discharge from Family Dependency Drug Court and more than 20 months after the children were taken into care.

Moreover, at the time of termination, almost 22 months had passed since respondent-mother was discharged from the Family Dependency Drug Court. Everyone agreed that respondent-mother had made progress with attending parenting time visitations and maintaining her sobriety and that she was doing well in Felony Drug Court. However, as of March 29, 2018, respondent-mother did not have independent housing, employment, or stable income; rather, she planned to live with the children's maternal grandmother, who is on the central registry. Moreover, respondent-mother attributed her success to being involved in Felony Drug Court, which is a regimented program, as opposed to her own skill set. Given respondent-mother's history, her failure to begin to make progress until nearly two years into the lengthy proceeding, and AF and KF's need for permanency, the trial court found that termination of respondent-mother's parental rights to AF and KF was proper. For the reasons discussed later in this opinion, this decision did not amount to clear error. On this record, we fail to see how the result of the proceeding would have been different had respondent-mother been provided with counsel at every Family Dependency Drug Court hearing.

Next, respondent-mother correctly notes that counsel was not present during a May 25, 2017 statutory review hearing, which was held before a referee. However, we fail to see how respondent-mother's substantial rights were affected by counsel's absence at this hearing. Indeed, after hearing the caseworker's report, the referee indicated that respondent-mother was making "some progress." After the hearing, the trial court entered an order, ordering that reasonable reunification efforts would continue to be made and that respondent-mother would continue to have supervised visitation with the children. Thus, respondent-mother's parenting time was not suspended and the permanency planning goal was not changed at the May 25, 2017 hearing. Although respondent-mother's parental rights to AF and KF were subsequently terminated, it was not until more than two years after the May 25, 2017 hearing. Furthermore, while it is unclear why counsel was not present at this hearing, respondent-mother was consistently provided with counsel at every other hearing, including the preliminary hearings, statutory review hearings,

---

[6] Notably, respondent-mother was provided with counsel before she was held in contempt and ordered to serve jail time. She was also provided with counsel before she was terminated from the program in August 2017.

permanency planning hearings, pretrial hearings, and termination hearings. Consequently, we conclude that respondent-mother is not entitled to relief under plain-error review.

## 3. INTERVIEWS

Next, respondent-mother argues that the trial court erred by conducting "unlawful in camera interviews with" the children.

At the outset, we note that petitioner argues that respondent-mother has waived this argument. We disagree. A waiver is the "intentional and voluntary relinquishment of a known right." *Walters v Nadell*, 481 Mich 377, 384 n 14; 751 NW2d 431 (2008). "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *Hodge v Parks*, 303 Mich App 552, 556; 844 NW2d 189 (2014) (quotation marks and citation omitted). Waiver occurs when a party stipulates to a matter before the trial court. *Id.* (stating that a party cannot stipulate to a matter before the trial court "and then argue on appeal that the resulting action was erroneous" and holding that the agreement amounted to a waiver that extinguished any error).

During a May 23, 2019 hearing, the trial court indicated on the record that, although its opinion and order was not yet complete, it had found statutory grounds for termination of respondent-mother's parental rights. The trial court indicated that the attorneys would have a copy of the opinion and order by May 28, 2019. The trial court then stated the following:

> *Trial Court*: I did speak to the attorneys before we came out and I think in terms of the best interest component of this that we agreed I believe on next Thursday, May 30th, and I think the attorneys agree that I would interview the three children in chambers, and we would set this up so that the parties would be able to view the interview as well. Is that fair, counsel? I think that's what the discussion was and that's what we agreed on?

> *Respondent-Mother's Attorney*: Yes, Your Honor.

> *Guardian Ad Litem*: Yes, Your Honor.

Thus, respondent-mother, through counsel, agreed that the trial court could interview the children in chambers. In so agreeing, respondent-mother was aware that "the parties" would be able to view the interviews. However, there is no indication that respondent-mother was aware that the guardian ad litem would be in chambers during the interviews and would be able to ask the children questions. Indeed, the trial court's brief logistical discussion only referenced the court interviewing the children; the guardian ad litem was not included. Thus, respondent-mother only agreed to the trial court interviewing the children in chambers with "the parties" being able to view the interviews. The trial court never sought—and respondent-mother never gave—her agreement about how the interviews would take place. Furthermore, it is unclear from the record whether respondent-mother thought that "the parties" included her attorney or whether she believed that her attorney would be present in chambers during the interviews and would be given the opportunity to ask questions. Consequently, because the record only supports that respondent-mother consented to the trial court interviewing AF and KF, we conclude that the issue was forfeited instead of waived. See *In re Ferranti*, 504 Mich at 32-34. Therefore, our review is for

-14-

plain error affecting substantial rights. See *In re HRC*, 286 Mich App at 450 ("Because [the] respondents did not object to the trial court's decision to conduct the interviews, our review is for plain error affecting substantial rights.").

Respondent-mother argues that the manner in which the interviews were conducted violated her right to due process. "Parents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *In re JK*, 468 Mich at 210. The state may constitutionally terminate a parent's parental rights if it affords the parent fundamentally fair procedures, which includes proof by clear and convincing evidence that termination is warranted. See *Santosky v Kramer*, 455 US 745, 753-756; 102 S Ct 1388; 71 L Ed 2d 599 (1982). "A respondent is afforded the opportunity to present evidence and witnesses at a hearing on the termination of parental rights and to confront and cross-examine evidence and witnesses used against the respondent." *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000).

In this case, the trial court interviewed AF and KF in chambers. The guardian ad litem was present in chambers during the interviews and was permitted to ask questions. Respondent-mother's counsel was not present during the interviews and was not provided with an opportunity to ask AF or KF any questions. During the interviews, AF and KF made statements that were relevant to the trial court's best-interest determination. Consequently, we conclude that the trial court plainly erred by only providing the guardian ad litem with the opportunity to question AF and KF. See *In re Ferranti*, 504 Mich at 34 n 16 (noting that due process concerns would not have been triggered had the trial court "examined the child on the record, in the presence of the parties and counsel, and *with the opportunity for examination of the witness*") (emphasis added). Given the plain error, we must determine whether that error affected respondent-mother's substantial rights. We conclude that it did not.

During the interviews, AF stated that he did not want to return to respondent-mother's care and that he wanted to remain in his foster home. AF also indicated that he had seen respondent-mother use a "vape." Although KF stated that he wanted to return to respondent-mother's care, he also indicated that he would want to stay with his foster mother if he was unable to return to respondent-mother's care. It is clear from the trial court's written opinion that the court partially relied on the information obtained in the interviews when it issued its findings of fact and conclusions of law relative to the determination of the children's best interests. Nonetheless, respondent-mother was aware of the questions that were asked of the children by the trial court and the guardian ad litem, and the children's responses because the interviews were recorded, able to be viewed by those present in the courtroom, and transcribed into the record.[7] Cf. *In re HRC*,

---

[7] In Docket No. 349761, respondent-father argues in a cursory manner that he did not hear the interviews and "therefore could not meaningfully respond to them." However, there is no indication that respondent-father's attorney was not present in the courtroom and/or was unable to question witnesses based on the children's responses to the questions posed by the trial court and the guardian ad litem. Moreover, evidence was presented through other witnesses that AF and KF did not wish to be placed with respondent-father, that AF did not want to have communication with respondent-father, and that AF and was afraid of respondent-father.

286 Mich App at 455; *In re Ferranti*, 504 Mich at 34-35. Because the interviews took place at the beginning of the best-interest portion of the termination hearing, respondent-mother was given the opportunity to counter any damaging statements that were made during the interviews. Indeed, respondent-mother attempted to do so.

Moreover, evidence of AF's desire not to return to respondent-mother's care was not just introduced through the interviews. Rather, the caseworker, AF's therapist, and AF's foster mother all testified that AF wanted to remain in the foster home. Additionally, and importantly, AF's therapist testified that AF would probably not "do well" in respondent-mother's care and that he would be emotionally damaged if he was not provided with consistency and permanency within a short period of time. The therapist also noted that, although KF wanted to return to respondent-mother's care, he worried that there would be issues with housing and food if he returned to respondent-mother's care. The therapist opined that it would be harmful to separate AF and KF, and the trial court relied upon the therapist's testimony when holding that it was in AF and KF's best interests to terminate respondent-mother's parental rights. Given the overwhelming evidence in this case, we cannot say that that respondent-mother's substantial rights were affected or that the interviews "seriously affected the fairness, integrity or public reputation of judicial proceedings." See *Randolph*, 502 Mich at 10. Consequently, respondent-mother is not entitled to relief on plain-error review.

### 4. STATUTORY GROUNDS

Respondent-mother argues that the trial court clearly erred by finding clear and convincing evidence supporting the statutory grounds cited in support of termination. We find no clear error warranting reversal.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). "We review the trial court's determination for clear error." *Id.* "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made," with the reviewing court "defer[ring] to the special ability of the trial court to judge the credibility of witnesses." *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014).

We conclude that the trial court did not clearly err by finding that grounds for terminating respondent-mother's parental rights to AF and KF were established under MCL 712A.19b(3)(j). MCL 712A.19b(3)(j) authorizes termination under the following circumstances:

> There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm, as well as physical harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

Throughout the proceeding, respondent-mother made impulsive and irrational decisions, such as marrying a man whom she had only known for several months. Respondent-mother acknowledged that her husband, who committed suicide during the proceeding, was abusing

substances during their relationship. Respondent-mother did not demonstrate a commitment to maintaining her sobriety until nearly two years into the proceeding despite being provided with a myriad of services.[8] Respondent-mother refused to take psychotropic medications until sometime in 2019 despite being diagnosed with several mental health conditions that affected her ability to parent during the proceeding. Respondent-mother also failed to consistently attend parenting time visitations when she was free from incarceration. This was the case even though respondent-mother was told that her inconsistency impacted the children's behavior and mental health. While respondent-mother's attendance and timeliness ultimately improved, according to caseworkers, this did not occur until after the second supplemental petition was filed. Even when respondent-mother was at her best, she only saw the children twice each week for supervised parenting visitations. In the time before termination, she continued to struggle with discipline and boundaries.

Importantly, respondent-mother attributed her improvement to her participation in Felony Drug Court, thereby demonstrating that respondent-mother had not yet learned to create her own structure and that she required a strict environment to stay on track. When asked "what would have happened had [she] not gone to the felony Drug Court," respondent-mother responded "I really couldn't tell you." Thus, although respondent-mother had demonstrated commendable progress, she had done so only for a relatively short period of time and while she was a participant in a highly structured program. Additionally, when the trial court determined that statutory grounds for termination existed, respondent-mother had only been out of inpatient treatment for six months.

Respondent-mother continued to demonstrate impulsive behavior in the time leading up to termination. As of February 28, 2019, respondent-mother was living with a man to whom she provided care in lieu of paying rent. Respondent-mother acknowledged that she did not have a written lease agreement or any formal contract that entitled her to remain in that home. Nonetheless, respondent-mother opined that AF, BF, and KF could live in that home, which only contained three bedrooms. At the March 29, 2019 termination hearing, it was revealed that respondent-mother intended to move in with the children's maternal grandmother and the maternal grandmother's fiancé, who had not seen the children for the duration of the proceeding. Respondent-mother acknowledged that she had not informed the caseworker of her intention to move. Therefore, at the close of proofs in the statutory grounds portion for termination hearing, the caseworker had not yet viewed the home.

In sum, although respondent-mother had made progress, evidence establishes that she was inconsistent throughout the lengthy proceeding and continued to struggle with consistency and rational decision making. At the February 28, 2019 hearing, respondent-mother testified that she had to put herself first, that she was still building "a foundation," and that she would require an additional 90 days to acquire independent housing and stable employment. Testimony supported

---

[8] Although respondent-mother testified that she had not "used" since July 2, 2018, and that the September 29, 2018 drug screening was inaccurate, the trial court apparently found this testimony to be incredible given that it noted that respondent-mother tested positive for substances on September 29, 2018.

that AF and KF were experiencing anxiety and behavioral issues because they required permanency. Indeed, AF and KF were nine years old, had been in care for 2-1/2 years, and required mental health treatment. If returned to respondent-mother, it is unclear if AF and KF would continue to obtain their required mental health treatment given respondent-mother's other responsibilities and her lack of independent transportation. Importantly, AF expressed a clear desire not to return to respondent-mother's care.

We conclude that the record supports that there is a reasonable likelihood that AF and KF would experience emotional harm if returned to respondent-mother given that she lacked the ability to provide AF and KF with the consistency, permanence, and stability that they required at the time of termination. Therefore, the trial court's finding that termination of respondent-mother's parental rights was proper under MCL 712A.19b(3)(j) does not leave us with a definite and firm conviction that a mistake has been made. Because we have concluded that at least one ground for termination existed, we need not specifically consider the additional grounds upon which the trial court based its decision. *In re HRC*, 286 Mich App at 461.

## 5. BEST INTERESTS

Respondent-mother argues that the trial court erred by finding that termination of her parental rights was in AF and KF's best interests. We disagree.

"The trial court must order the parent's rights terminated if the Department has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). We review the trial court's best-interest determination for clear error. *Id.*

This Court focuses on *the children*—not the parents—when reviewing best interests. *In re Trejo Minors*, 462 Mich at 356. "In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party." *In re Medina*, 317 Mich App 219, 237; 894 NW2d 653 (2016) (quotation marks and citation omitted).

> [T]he court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citations omitted).]

Although the record supports that respondent-mother was bonded with AF and KF, the record also supports that respondent-mother was inconsistent with attending visitations throughout a majority of the lengthy proceeding. Respondent-mother was incarcerated at times during the proceeding, which resulted in her being unable to visit the children for periods of time. This occurred despite respondent-mother being warned that inconsistency affected the children's mental health and behavior at school. At times during the visitations, respondent-mother struggled to discipline the children, lacked boundaries, and had inappropriate conversations with the

children. Additionally, respondent-mother was never able to have unsupervised parenting time with AF and KF. Indeed, for most of the proceeding, respondent-mother only had one parenting time for one hour each week. Importantly, AF repeatedly indicated that he did not want to return to respondent-mother's care. Thus, although respondent-mother shared a bond with AF and KF at the time of termination, the record supports that the bond was not healthy for the children. See *In re CR*, 250 Mich App 185, 197; 646 NW2d 506 (2002), overruled on other grounds by *In re Sanders*, 495 Mich 394 (2014) (holding that the fact that there was a "serious dispute" on the record concerning whether the respondent "had a healthy bond of any sort with her children" supported that termination of her parental rights was in the children's best interests).

Additionally, the parent-child bond is only one factor for the trial court to consider. *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012). As discussed above, respondent-mother lacked commitment for a vast majority of the proceeding and was unable to provide consistency, stability, and permanency at the time of termination. Indeed, at the time of termination, respondent-mother lacked stable income and housing, was attempting to maintain her tenuous sobriety, and had been charged with assault and battery.

Meanwhile, AF and KF were doing well in their placement, where they had the opportunity to achieve permanency and stability. The record supports that AF and KF were bonded to their foster parents, with whom they had been placed since May 24, 2017. AF expressed that he wanted to remain in the foster home and was "very adamant that he want[ed] to be adopted." Although KF wanted to be reunified with respondent-mother, he believed that it would be a "win situation either way if he went home to his mom or stayed" in the foster home. Importantly, AF and KF's therapist testified that AF risked permanent psychological damage if he was not provided with consistency, permanency, and stability in the very near future. As of the May 30, 2019 best-interest hearing, AF had been suspended from school because he had threatened to bring a gun to school and shoot a classmate's parent. AF's foster mother attributed this behavior to extreme stress.

Although respondent-mother is correct that the trial court found that it was not in BF's best interests for respondent-mother's parental rights to be terminated to him, this argument is inapposite. When deciding best interests, "the trial court has a duty to decide the best interests of each child individually." *In re Olive/Metts*, 297 Mich App at 42. In this case, the trial court clearly considered each child's individual needs and determined that the needs of BF, AF, and KF differed. This finding is supported by the record.

BF is 21 months older than AF and KF. During the proceeding, BF repeatedly expressed that he missed his family. BF's therapist testified that BF was not happy in his foster home, that he wanted to return to respondent-mother's care, and that it would be damaging for him to not return to respondent-mother's care. In contrast, AF and KF were content in their foster home, and AF indicated that he wanted to be adopted. According to AF's therapist, it was in AF's best interests to remain in his foster home; the therapist noted that AF began shaking and tearing up when the possibility of returning to respondent-mother's care was broached. Testimony supported that AF and KF's foster parents were dedicated to their care and were interested in adopting them. Although the trial court's decision resulted in AF and KF being separated from BF, they had been placed in separate homes for a vast majority of the proceeding. AF and KF's therapist also believed that AF and KF should not be separated because they relied on each other for support and that they

were not especially bonded with BF. Importantly, AF indicated that he did not want to live in the same home as BF. This evidence is supported by the testimony of AF and KF's foster mother.

Moreover, all of the children had mental health issues and had not been in respondent-mother's care since October 13, 2016. Respondent-mother was still in the process of completing Felony Drug Court and securing steady employment and income. Additionally, respondent-mother testified that she needed to put herself first in order to maintain her sobriety and that she was still building "a foundation." Given this testimony and respondent-mother's history, it is unlikely that respondent-mother would have been able to continue making progress while caring for all of the children and their extensive needs. Indeed, during most of the proceeding, respondent-mother struggled with managing all three of the children during the one-hour parenting times. Additionally, given respondent-mother's transportation issues throughout the proceeding, it is unclear if respondent-mother would be able to bring all of the children to school and to their mental health appointments. For these reasons, we conclude that the trial court did not clearly err by finding that termination of respondent-mother's parental rights to AF and KF was in their best interests.

## B. RESPONDENT-FATHER (DOCKET NO. 349761)

## 1. STATUTORY GROUNDS

Respondent-father argues that the trial court clearly erred by finding that statutory grounds existed to terminate his parental rights to AF and KF. We conclude that the trial court did not clearly err by finding that grounds for terminating respondent-father's parental rights were established under MCL 712A.19b(3)(c)(*i*), which provides the following:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

This Court has previously held that termination was proper under (c)(*i*) where "the totality of the evidence amply support[ed] that [the respondent] had not accomplished any meaningful change in the conditions" that led to adjudication. *In re Williams*, 286 Mich App at 272.

In this case, at the time of termination, "182 or more days" had "elapsed since the issuance of [the] initial dispositional order" with respect to respondent-father. See MCL 712A.19b(3)(c)(*i*). Furthermore, the record establishes that respondent-father had not accomplished any meaningful change in the condition that led to adjudication, i.e., his inability to provide proper care and custody to AF and KF.

Respondent-father had not been actively involved in AF and KF's lives since he became incarcerated in 2013 for unarmed robbery, possession of a firearm during commission of a felony, felon in possession of firearm, and larceny of a firearm. He continued to be incarcerated throughout the lengthy proceeding. Although respondent-father could have provided for AF and

KF's care and custody during the proceeding "by voluntarily granting legal custody to his relatives during [the] remaining term of [his] incarceration," *In re Mason*, 486 Mich 142, 163; 782 NW2d 747 (2010), none of the relatives that respondent-father named were able or willing to provide appropriate care. Consequently, AF and KF remained in foster care throughout the proceeding. Additionally, while respondent-father attempted to provide emotional support to AF and KF by sending them letters and by engaging in telephone conversations with them, AF did not enjoy these interactions. Indeed, he expressed fear that respondent-father was going to "take" him. Thus, the totality of the evidence amply supports that respondent-father had not accomplished any meaningful change in the condition that led to adjudication. See *In re Williams*, 286 Mich App at 272.

Furthermore, the record clearly establishes that there was no reasonable likelihood that the condition that led to adjudication would "be rectified within a reasonable time considering the child[ren]'s age[s]." See MCL 712A.19b(3)(c)(*i*). At the time of termination, the earliest that respondent-father would be released from prison was March 2020, and he had not named any family members who were able and/or willing to care for the children.

Respondent-father testified that he would have to locate housing and employment after he was released from prison. He also acknowledged that he would not be able to obtain financial support from family members. Although respondent-father testified that he had job skills, it is unclear what type of employment respondent-father would be able to obtain given his criminal history. Additionally, there is no evidence that respondent-father had ever provided substantial support for his children. AF and KF, who had been in care for 2-1/2 years of their young lives, desperately required consistency, permanency, and stability. Given AF and KF's need for permanency, they could not wait an indefinite amount of time for respondent-father to be able to provide them with proper care and custody. See, e.g., *In re Dahms*, 187 Mich App 644, 647-648; 468 NW2d 315 (1991) (holding that, because the Legislature did not intend for children to be left in foster care indefinitely, it is proper to focus on how long it will take a respondent to improve and on how long the involved children can wait). The trial court's finding that termination was proper pursuant to MCL 712A.19b(3)(c)(*i*) does not leave us with a definite and firm conviction that a mistake has been made. Because we have concluded that at least one ground for termination existed, we need not consider the additional grounds upon which the trial court based its decision.[9] See *In re HRC*, 286 Mich App at 461.

In reaching this conclusion, we reject respondent-father's argument that termination was improper because he was "provided insufficient services." Because this issue is unpreserved, *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012), our review is limited to plain error affecting respondent-father's substantial rights, *Randolph*, 502 Mich at 10.

---

[9] Although respondent-father cites *In re Mason* to support that termination was improper, the facts in *In re Mason* are distinguishable from the facts herein. The respondent in *In re Mason* had directed placement of the children with his mother during the proceeding, had employment and appropriate housing set up for when he was released from prison, had financially provided for the children in the past, and had a relationship with the children before the child protective proceeding was initiated. *In re Mason*, 486 Mich at 147-148, 150-151.

In arguing that he was provided with insufficient services, respondent-father fails to explain or rationalize what services petitioner could have provided to him while he was incarcerated. Indeed, as noted by the trial court, it could not order the Michigan Department of Corrections to provide services to respondent-father if the services were not available in the prison. Even so, the record supports that respondent-father was able to participate in some services. Importantly, respondent-father testified at the termination hearing that he was able to participate in a parenting class and that he had benefitted from the parenting class. Respondent-father also testified that he had participated in substance abuse classes and had taken classes that would assist him with getting employment once he was released from prison. Additionally, aside from the Family Dependency Drug Court hearings, respondent-father participated in all of the hearings via video and/or telephone, and he was able to have weekly telephone contact with AF and KF beginning in 2017. Respondent-father was also provided with counsel, and the record supports that the caseworker kept in contact with respondent-father after the trial court obtained jurisdiction and that the caseworker contacted the prison to determine what services were available to respondent-father. Moreover, the trial court did not terminate respondent-father's parental rights because he did not participate in services. Cf. *In re Mason*, 486 Mich at 150, 163. Rather, the trial court terminated respondent-father's parental rights because he could not provide proper care or custody for the children. Consequently, we conclude that respondent-father has failed to establish plain error affecting his substantial rights.

## 2. BEST INTERESTS

Respondent-father argues that the trial court erred by finding that termination of his parental rights was in AF and KF's best interests. We disagree.

"In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party." *In re Medina*, 317 Mich App at 237 (quotation marks and citation omitted).

> [T]he court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citations omitted).]

In this case, respondent-father became incarcerated in 2013 when AF and KF were very young. AF and KF did not remember respondent-father being involved in their lives and even asked one of the caseworkers to describe what respondent-father looked like to them. Although respondent-father attempted to emotionally connect with AF and KF via telephone calls and letters, the record supports that these communications were "superficial." AF repeatedly expressed that he did not want to communicate with respondent-father. During the weekly telephone call, AF would often leave the room, play with a loud toy "to interrupt the phone call," or not "talk at all." AF also would have behavioral issues at school after the weekly telephone calls and had requested that his foster parents wait outside the bathroom while he showered because he was afraid that respondent-father would "take" him. AF also exhibited anxiety about what would happen in

March 2019 because he was aware that respondent-father was eligible for parole at that time. Although KF interacted with respondent-father during the phone calls, he rarely talked about him and did not seem to believe that he would ever be placed with respondent-father. Thus, while it is clear that respondent-father loves AF and KF, the evidence does not support that AF and KF were bonded to him.[10]

Given the amount of time that they had spent in care, AF and KF required consistency, stability, and permanency. Respondent-father, who was imprisoned throughout the proceeding, was unable to provide this to them at the time of termination. Indeed, respondent-father's attempts to have them placed with relatives were unsuccessful and it was unknown when or if respondent-father would be granted parole. Meanwhile, AF and KF were doing well in their pre-adoptive placement, where they had the opportunity to achieve permanency and stability. The record supports that the children were bonded to their foster parents and that AF wished to be adopted. The record further supported that it would be harmful to separate AF and KF. Although the trial court determined that it was not appropriate to terminate respondent-father's parental rights to BF, BF's needs were different from that of AF and KF for the reasons already discussed in Docket No. 349545. See *In re Olive/Metts*, 297 Mich App at 42. Moreover, BF remembered respondent-father from before he was imprisoned and expressed happiness that he was having contact with respondent-father during the proceeding. For these reasons, we conclude that the trial court did not clearly err by finding that termination of respondent-father's parental rights to AF and KF was in their best interests.

Affirmed in both dockets.

/s/ Anica Letica
/s/ Michael J. Riordan
/s/ Thomas C. Cameron

---

[10] Respondent-father complains that his letters were withheld from the children at times during the proceeding. However, respondent-father does not cite any authority to support that termination was improper as a result of this. To the extent that respondent-father argues that the withholding of the letters resulted in his bond being damaged with AF and KF, the record supports that the lack of bond was related to the fact that respondent-father had been incarcerated for a majority of AF and KF's young lives.